

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| K. TRACY BERGQUIST, ON BEHALF OF HERSELF AND ALL OTHER SHAREHOLDERS OF FYBX CORPORATION | * * * * | CIVIL ACTION NO. 02-722 |
| PLAINTIFF | * | SECTION "R" |
| VERSUS | * * | MAG. (4) |
| FYBX CORPORATION, MICHAEL P. ARATA HOFFMAN, SIEGEL, SEYDEL, BIENVENU, CENTOLA & CORDES, (A PROFESSIONAL LAW CORPORATION), and BORDELON, HAMLIN & THERIOT | * * * * * | |
| DEFENDANTS | * * | |

*   *   *   *   *   *   *   *

## MOTION FOR SANCTIONS AGAINST NANCY J. MARSHALL AND INCORPORATED MEMORANDUM IN SUPPORT

COMES NOW Plaintiff K. Tracy Bergquist and moves the Court to order sanctions reasonable under the circumstances against Nancy J. Marshall, counsel for Defendants Arata and Hoffman, Siegel.  In support of this Motion, Plaintiff shows the Court as follows:

Ms. Marshall has displayed a pattern of conduct in this case that has been highly unprofessional.  In practically every interaction between counsel for Plaintiff and Ms. Marshall, Ms. Marshall has been abusive and vulgar.  Plaintiff has been hesitant to file this Motion, but the extent and continuous nature of Ms. Marshall's behavior has made it necessary to call it to the Court's attention.

For example, on May 6, 2003, Ms. Marshall e-mailed Plaintiff's counsel, Kevin Armbruster, and informed him: "Please address me by my full name.  Only scum attempt to default people without notice."  (A true and correct copy of the May 6, 2003 e-mail is attached as Exhibit A.)  Despite Mr. Armbruster's plea that counsel "move forward on a more civil basis," Ms.

Marshall's conduct only escalated from there. (Ex. A.)

Perhaps her worst offense was during a conference call between all counsel on June 5, 2003 to discuss rescheduling depositions. On at least four occasions during that call, without any provocation or justification (not that such conduct is ever justified), Ms. Marshall called or referred to Plaintiff's counsel as "assholes" or "fucking assholes."

Further evidence of Ms. Marshall's pattern of inappropriate behavior is gleaned from the depositions. She has made it a practice to make derogatory, snide comments (often "under her breath") during depositions or other conversations. See e.g., Hondroulis Dep. 92, 97, 117, 118, 120, 136, 139, 142, 145, 146, 149, 160, 180, 218 (Ex. B); Arata Dep. pp.103-104, 176 (Ms. Marshall uses inappropriate language), 125-126, 130-131and 133 (Ms. Marshall accuses Plaintiff's counsel and Plaintiff of criminal acts), 134, 166-167. (Ex. C)

Indeed, during the FyBX 30(b)(6) deposition on June 18, 2003, Ms. Marshall sat reading a newspaper for a good portion of the deposition. She would then interrupt counsel to have things repeated because she had not heard them, due to her own inattention.

Furthermore, she has unjustly, and without any support, accused Plaintiff's counsel of lying and other dishonest conduct on numerous occasions. For example, during the deposition of Mr. Hondroulis on June 16, 2003, Ms. Marshall accused Plaintiff and her counsel of serious discovery violations, ranting that Plaintiff's counsel was using as exhibits two documents that Plaintiff had failed to produce and that neither she nor Mr. Pratt had purportedly ever seen before. (Ex. B, Hondroulis Dep. at 67-71.) These allegations continued despite Plaintiff's counsel's telling Ms. Marshall that the exhibits had either come from documents produced by Defendants in discovery or were attached as exhibits to Defendants' briefs. (Id.) Plaintiff's counsel later confirmed and pointed out to an unapologetic Ms. Marshall that the documents were indeed Exhibit 9 to her clients' motion for summary judgment.[1] Ms. Marshall was not only unrepentant, but she

---

[1]    It appears Ms. Marshall's clients failed to produce those documents during discovery.

2

also renewed her unfounded claim that Plaintiff was withholding documents.  (Ex. B, Hondroulis

Dep. at 77-78.)

Similarly, during Defendant Arata's deposition, Ms. Marshall wrongly accused Plaintiff's

counsel of lying:

> Q:       And did you advise them on that consent decree?
> MR. EVERITT:       Objection.  Attorney-client privilege, FyBX's.
> A:       Yeah.  I don't think I should give you what I advised my clients to do or not
> to do in that regard.
> BY MR. GRECH:       So you are asserting the attorney-client privilege for that?
> A:       I am.
> Q:       Even though you have produced tons of documents on the same issue with
> communications between you and your client on the same issue?
> A:       Well, I'm not going to argue with you.  The documents speak for
> themselves, and documents can say what they say.  I'm not going to tell you what
> advice I gave to my clients and what advice they sought from me with regard to
> those documents.
> Q:       I'm just saying that that's a waiver of the attorney-client privilege.
> MS. MARSHALL:       Wait.  We can argue that in court.
> THE WITNESS:       Yeah.  File a motion.
> BY MR. GRECH:
> Q.       I'm not asking you for what your advice is.  I'm asking you whether you
> advised them.
> MS. MARSHALL:       You specifically asked him what his advice was.  So don't
> make lies.
> MR. GRECH:       I don't believe I did, but if I did --
> MS. MARSHALL:       You want to read it back?
> MR. EVERITT:       Let's read the record back.
> MS. MARSHALL:       Yes.
> (Requested material read back by the court reporter).
> [Q:       And did you advise them on that consent decree?]
> BY MR. GRECH:
> Q.       Well, did you give them advice on it?
> MS. MARSHALL:       Same objection.
> THE WITNESS:       Let me confer for a second.
> MS. MARSHALL:       Just don't answer the question.  Go on.
> THE WITNESS:       All right.
> A.       I'm not going to answer that on the grounds that I have an attorney-client
> privilege, and I have been instructed by my attorney not to answer it.

(Ex. C, Arata Dep. at 97-99 (emphasis added).)

In an address to the American Law Institute in 1971 Chief Justice Warren Burger

characterized lawyers who could not behave as "a menace and a liability, not an asset to the

aministration of justice."  The Chief Justice said:

> Someone must teach that good manners, disciplined behavior, and civility-- by whatever name--are the lubricants that prevent lawsuits from turning into combat. More than that, civility is really the very glue that keeps an organized society from flying into pieces.... I submit that lawyers who know how to think but have not learned to behave are a menace and a liability, not an asset, to the administration of justice.

WARREN E. BURGER, DELIVERY OF JUSTICE 175 (1990) (*reprinted in In re Appl'n of McLaughlin for Admission to the Bar of New Jersey,* 144 N.J. 133, 675 A.2d 1101, 1112 n. 9 (1996)).

Federal courts have the undisputed inherent power to regulate practice in cases pending before them. Chambers v. NASCO, Inc., 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). This power originates from "the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." Natural Gas Pipeline v. Energy Gathering, Inc., 2 F.3d 1397, 1406 (5th Cir. 1993), quoting, Link v. Wabash R. Co., 370 U.S. 626, 630, 82 S.Ct. 1386, 1389, 8 L.Ed.2d 734 (1962). In exercising this power, a court can sanction a party for abuse of judicial processes. See Chambers, 501 U.S. at 43-44, 111 S.Ct. 2132-33.

Courts are vested with great discretion in imposing sanctions under their inherent powers, limited by the principles that inherent powers must be exercised with "restraint and discretion," and that the particular sanction must be tailored to address the harm identified. Chambers, 501 U.S. at 44-45, 111 S.Ct. 2123. No finding of "bad faith" is required to sanction counsel under the court's inherent powers unless the sanction involves fee shifting. See Republic of Philippines v. Westinghouse Electric Corp., 43 F.2d 65, 74, n. 11 (3d Cir. 1994).

To Ms. Marshall, as has been made apparent by her actions in this case, litigation is a form of mortal combat which she must win at any and all costs, rather than the structured and professional mechanism civilized society has established for peaceably resolving legitimate disputes. One of the obvious effects of such incivility and this "scorched-earth" approach to litigation is to discourage cooperation between lawyers. See Thomason v. Lehrer, 182 F.R.D.

4

121, 122 (D.N.J. 1998).

Persistent misconduct of the type that has occurred in this matter is sanctionable. The use of obscenity, "smart" remarks designed to obstruct depositions and intimidate counsel, and the accusations leveled without retraction against Plaintiff's counsel. See, e.g., Carroll v. The Jacques Admiralty Law Firm, P.C., 110 F.3d 290 (5th Cir. 1997) (Sanctions for use of obscenity by attorney litigant during deposition.); Hall v. Clifton, 150 F.R.D. 525 (E.D.Pa. 1993)(Discusses need for civility in depositions as laying groundwork for entire litigation process.).

The reulations governing attorney practice in Louisiana prohibit this mode of litigation. The Code of Professionalism, approved by the Louisiana Supreme Court on January 10, 1992 and adopted by the Louisiana State Bar Association House of Delegates for the Bar membership requires Louisiana attorneys to ". . . conduct myself with dignity, civility, courtesy and a sense of fair play." Closely related to the Code's civility requirement is its provision that, "I will not file or oppose pleadings, conduct discovery or utilize any course of conduct for th epurpose of undue delay or harassment of any other counsel or party." Additionally, the Code of Professionalism states that, "I will not engage in personal attacks on other counsel . . . " Finally, it provides that," "I will not use the threat of sanctions as a litigation tactic."[2] This Honorable Court adopted the Code of Professionalism by a General Order dated August 4, 1999.

Ms. Marshall's illustrated pattern of ad hominum attacks on Plaintiff's counsel at deposition proceedings, her accusations that Plaintiff's counsel is "making lies", her abusive and vulgar language in referring to Plaintiff's counsel as "assholes" and "fucking assholes" in a telephone conference is beyond the scope of professional behavior and constitutes conduct subject

---

[2] In what should be an unsurprising move considering Ms. Marshall's conduct herein, a Rule 11 safeharbor letter was sent via facsimile after the end of the business day on July 3, 2003. The timing of this safe harbor letter, coming after all of the other conduct at issue herein, immediately before the start of final trial preparation efforts, and being transmitted after hours on the last business day before a holiday weekend, all indicate the purpose was to use the threat of sanctions as a litigation tactic to harass or intimidate Plaintiff's counsel. Such conduct violates the Code of Professionalism. Wood v. New Orleans National Collection Service, Inc., 1995 WL 686744 (E.D.La. 11/17./1995).

to sanction by the Court. Sanctions need not be in the form of fee-shifting monetary damages, which have been held to require a finding of bad faith, but could be in another form.

The legal profession is often said to have lost a degree of civility practiced in the past. That does not excuse Ms. Marshall's behavior, however. Plaintiff's counsel is used to the rough and tumble of litigation and has never before seen fit to pursue a motion of this sort. Simply put, Ms. Marshall's conduct is beyond the pale and warrants sanctions pursuant to Every lawyer is charged with acting with at least a modicum of decorum. The Court should remind Ms. Marshall of this.

WHEREFORE, Plaintiff prays that this Motion be granted and that the Court enter an Order sanctioning Nancy J. Marshall granting relief as the Court deems just and proper.

Respectfully Submitted,

DONALD L. HYATT, II (24808)
DONALD L. HYATT, II APLC
Energy Centre, Suite 2960
1100 Poydras St.
New Orleans, LA 70163
Telephone: (504) 582-2466
*COUNSEL FOR PLAINTIFF, TRACY K. BERGQUIST*

CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record by placing same, postage prepaid and properly addressed in the United States Mail, this 7<u>th</u> day of July _____, 2003.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| K. TRACY BERGQUIST, ON BEHALF | * | CIVIL ACTION |
| OF HERSELF AND ALL OTHER | * | |
| SHAREHOLDERS OF FYBX | * | NO. 02-722 |
| CORPORATION | * | |
| PLAINTIFF | * | SECTION "R" |
| VERSUS | * | |
| | * | MAG. (4) |
| FYBX CORPORATION, MICHAEL P. ARATA | * | |
| HOFFMAN, SIEGEL, SEYDEL, BIENVENU, | * | |
| CENTOLA & CORDES, (A PROFESSIONAL | * | |
| LAW CORPORATION), and BORDELON, | * | |
| HAMLIN & THERIOT | * | |
| DEFENDANTS | * | |
| | * | |
| *    *    *    *    *    *    * | * | |

## NOTICE OF HEARING

PLEASE TAKE NOTICE that the undersigned, on behalf of plaintiff, Tracy K. Bergquist, will bring for hearing Plaintiff's Motion for Sanctions Against Nancy J. Marshall And Incorporated Memorandum In Support, before the Honorable Sarah Vance, Judge of the United States District Court for the Eastern District of Louisiana, Section "R", 500 Camp St., New Orleans, Louisiana 70130, on the 23d day of July, 2003, at **10:00 o'clock a.m.**, or as

soon thereafter as this matter may be heard. Pursuant to Local Rule 78.1E this motion shall be determined without oral arguments unless the Court directs otherwise.

Respectfully Submitted,

DONALD L. HYATT, II (24808)
DONALD L. HYATT, II APLC
Energy Centre, Suite 2960
1100 Poydras St.
New Orleans, LA 70163
Telephone: (504) 582-2466
*COUNSEL FOR PLAINTIFF,*
*TRACY K. BERGQUIST*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record by placing same, postage prepaid and properly addressed in the United States Mail, this 7th day of July _____, 2003.

Subj:      **FW: Additional note to Nancy Marshall**
Date:      Wednesday, May 7, 2003 9:40:45 AM
From:      kra@cmamlaw.com
To:        hyattlaw@aol.com

Kevin R. Armbruster
Cushing, Morris, Armbruster & Montgomery, LLP
2110 Peachtree Center International Tower
229 Peachtree Street, NE
Atlanta, Georgia    30303
Tel. no.:    404.614.8103
Fax no.:    404.521.0579
E-mail:    kra@cmamlaw.com


-----Original   Message-----
From: Kevin R. Armbruster
Sent: Tuesday, May 06, 2003 6:30 PM
To: 'Collier, Nancy'
Subject: RE: Additional note to Nancy Marshall


Dear Ms. Marshall--

Not in Georgia, by any stretch of the imagination. My apologies for the cultural difference, but that's what we have local counsel for, who advised us otherwise. And in Georgia, a remark like that would draw sanctions. I forgive you, and hope we can move forward on a more civil basis.

You may address me by my first name if you please.

Kevin

Kevin R. Armbruster



Cushing, Morris, Armbruster & Montgomery, LLP
2110 Peachtree Center International Tower
229 Peachtree Street, NE
Atlanta, Georgia    30303
Tel. no.:    404.614.8103
Fax no.:    404.521.0579
E-mail:    kra@cmamlaw.com


-----Original    Message-----
From: Collier, Nancy [mailto:NCollier@DKSLaw.com]
Sent: Tuesday, May 06, 2003 6:10 PM
To: Kevin R. Armbruster
Subject: RE: Additional note to Nancy Marshall


Mr. Armbruster:

Please address me by my full name.  Only scum attempt to default people
without  notice.

Nancy Marshall

-----Original    Message-----
From: Kevin R. Armbruster [mailto:kra@cmamlaw.com]
Sent: Tuesday, May 06, 2003 6:09 PM
To: Collier, Nancy
Subject: Additional note to Nancy Marshall


Nancy--

Until you provided helpful responses to our discovery requests just two
weeks ago, we had not received any discovery. We haven't pressed the
matter until recently for 2 main reasons, among others:  (1)  we believe
we have enough to prove our case already, and the June deadline provides
plenty of time to complete our modest discovery needs, and (2)  we were
actively pursuing two other unrelated cases against FyBX and its cohorts
in Atlanta which resulted in favorable judgments and payment to Ms.

Bergquist of a substantial sum.  We obviously were not alone, for the defendants have obligingly been quiet until very recently.

I tell you this to dispel any thought on your part that we seek delay. On the contrary, this case now has our full attention.  If there has been any misunderstanding on this account, we apologize.


Kevin




Kevin R. Armbruster
Cushing, Morris, Armbruster & Montgomery, LLP
2110 Peachtree Center International Tower
229 Peachtree Street, NE
Atlanta, Georgia    30303
Tel. no.:    404.614.8103
Fax no.:    404.521.0579
E-mail:    kra@cmamlaw.com




---------------- Headers ----------------
Return-Path: <kra@cmamlaw.com>
Received: from rly-za01.mx.aol.com (rly-za01.mail.aol.com [172.31.36.97]) by air-za03.mail.aol.com
(v93.12) with ESMTP id MAILINZA33-22763eb91aed33e; Wed, 07 May 2003 10:40:45 -0400
Received: from  server1.cmam.local (mail.cmamlaw.com [64.90.4.126]) by rly-za01.mx.aol.com
(v93.12) with ESMTP id MAILRELAYINZA18-2e23eb91adb1aa; Wed, 07 May 2003 10:40:27 -0400
content-class: urn:content-classes:message
MIME-Version: 1.0
Content-Type: text/plain;
  charset="US-ASCII"
Content-Transfer-Encoding: quoted-printable
Subject: FW: Additional note to Nancy Marshall
X-MimeOLE: Produced By Microsoft Exchange V6.0.6249.0
Date: Wed, 7 May 2003 10:45:42 -0400
Message-ID: <E3DE8D1F8EE669458E5435239BCB976017646E@server1.cmam.local>
X-MS-Has-Attach:
X-MS-TNEF-Correlator:
Thread-Topic: Additional note to Nancy Marshall
Thread-Index: AcMUJgqZcZJAIQQSTZyK0EbUGwWeJQAAA6OgACAzICA=
From: "Kevin R. Armbruster" <kra@cmamlaw.com>
To: <hyattlaw@aol.com>

1

1              UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF LOUISIANA

3

4

5   K. TRACY BERGQUIST, ON   *   CIVIL ACTION
    BEHALF OF HERSELF AND     *   NO. 02-722
6   ALL OTHER SHAREHOLDERS    *
    OF FYBX CORPORATION,      *   SECTION R(4)
7              PLAINTIFF      *
                              *
8   VERSUS                    *
                              *
9   FYBX CORPORATION,         *
    MICHAEL P. ARATA,         *
10  HOFFMAN, SIEGEL, SEYDEL,  *
    BIENVENU, CENTOLA &       *
11  CORDES (A PROFESSIONAL    *   *ORIGINAL*
    LAW CORPORATION), AND     *
12  BORDELON, HAMLIN &        *
    THERIOT                   *
13             DEFENDANTS     *
    * * * * * * * * * * * * * * * * * * * * * * * *

14

15

16          Deposition of **MICHAEL P. ARATA**,
    3700 Orleans Avenue, New Orleans, Louisiana
17  70119, taken at the offices of Deutsch,
    Kerrigan & Stiles, L.L.P., 755 Magazine
18  Street, Fifth Floor, New Orleans, Louisiana
    70130, on Wednesday, the 21st of May, 2003.

19

20

    APPEARANCES:
21

22

        CUSHING, MORRIS & ARMBRUSTER, LLP
23      (BY:  Jason C. Grech, Esquire)
        229 Peachtree Street, N.E., Suite 2110
24      Peachtree Center - International Tower
        Atlanta, Georgia  30303
25          (Representing the Plaintiffs)

        JILL FREEMAN, INC. (504) 454-6374

1    What I handled was a complaint from a

2    shareholder in Alabama, and I went to an

3    informal hearing in Montgomery, Alabama, to

4    handle that complaint.

5        Q.    Is that all you did?

6        A.    No.  I think other documentation

7    will show that the Alabama Securities

8    Commission presented FyBX with a -- it was

9    either a consent judgment or some type of

10   consent decree, and I forwarded -- I

11   received that and then forwarded that to

12   FyBX.

13       Q.    And did you advise them on that

14   consent decree?

15   MR. EVERITT:

16            Objection.  Attorney-client

17   privilege, FyBX's.

18       A.    Yeah.  I don't think I should

19   give you what I advised my clients to do or

20   not to do in that regard.

21   BY MR. GRECH:

22       Q.    So you are asserting the

23   attorney-client privilege for that?

24       A.    I am.

25       Q.    Even though you have produced

JILL FREEMAN, INC. (504) 454-6374

1    tons of documents on the same issue with the

2    communication between you and your client on

3    the same issue?

4         A.    Well, I'm not going to argue with

5    you.  The documents speak for themselves,

6    and the documents can say what they say.

7    I'm not going to tell you what advice I gave

8    to my clients and what advice they sought

9    from me with regard to those documents.

10        Q.    I'm just saying that that's a

11   waiver of the attorney-client privilege.

12        MS. MARSHALL:

13            Wait.  We can argue in court.

14        THE WITNESS:

15            Yeah.  File a motion.

16   BY MR. GRECH:

17        Q.    I'm not asking you for what your

18   advice is.  I'm asking you whether you

19   advised them.

20        MS. MARSHALL:

21            You specifically asked him what

22   his advice was.  So don't make lies.

23        MR. GRECH:

24            I don't believe I did, but if I

25   did --

125

1    are asking me to speculate about whether

2    they actually resigned.  I think there is

3    documentation that shows that she didn't

4    resign from FyBX Environmental.

5         Q.    Well, she told everybody she

6    resigned, didn't she?

7         MS. MARSHALL:

8              So then she lied when she signed

9    the merger paper.  Cut the crap out and get

10   on to some real questions.

11        MR. GRECH:

12             You can let your client testify

13   and not make comments like that.  It's

14   inappropriate.

15        MS. MARSHALL:

16             Please.  Okay.  So she resigned

17   and she misrepresented herself and she

18   signed those documents.  Interesting.

19        MR. GRECH:

20             She resigned as an officer.  She

21   signed them as a director and shareholder.

22        MS. MARSHALL:

23             She signed as director, buddy.

24   Read your document carefully.  I wonder what

25   kind of lies she told.  So she is a

1    fraudulent misrepresentation.

2       MR. GRECH:

3          Well, your client said that she

4    didn't actually resign.

5       THE WITNESS:

6          No.  I --

7       MS. MARSHALL:

8          That's not what my client said.

9       THE WITNESS:

10         That's not what I said.

11      MS. MARSHALL:

12         I guess it makes it okay now.  So

13   we are going to stop this stupid line of

14   questioning or this stupid lawsuit?

15   BY MR. GRECH:

16      Q.    Let me ask you this:  Were you

17   representing FyBX Environmental's interest

18   at the same time you were representing

19   FyBX's during the merger negotiations?

20      A.    FyBX Corporation owned 75 percent

21   of the stock of FyBX Environmental

22   Corporation.  I was representing FyBX

23   Corporation during the negotiations between

24   FyBX and FyBX Environmental.

25      Q.    Well, weren't you the general

130

1    were any problems.  I think everybody

2    assumed that there was not any problem with

3    the FyBX corporate documents.

4         Q.    Well, weren't you in a better

5    position than Miss Bergquist to know whether

6    there were problems with those corporate

7    documents?

8         A.    I can't answer that.

9         Q.    Well, you are an attorney; she

10   isn't; isn't that right?

11        A.    You know, I think you are right

12   about that.  She is not an attorney.

13        Q.    And you drafted most of those

14   documents; isn't that right?

15        MS. MARSHALL:

16             Which documents are we talking

17   about?

18        MR. GRECH:

19             FyBX.

20        MS. MARSHALL:

21             Be specific.

22        MR. GRECH:

23             FyBX corporate records.

24        MS. MARSHALL:

25             Well, let's just have you spell

1    out each time what documents you are talking

2    about because the next thing I know you will

3    be telling him he drafted the shareholders

4    registration list because he drafted the

5    documents.  So you have to say every time

6    what specific documents you are talking

7    about.

8         A.    If you would please be specific.

9    BY MR. GRECH:

10        Q.    Oh, I clarified.

11        A.    Okay.

12        MR. GRECH:

13             What was it?  Can you read it

14   back.

15        (Requested material read back by the

16   court reporter).

17   BY MR. GRECH:

18        Q.    And we are talking about the

19   corporate records, including Articles of

20   Incorporation, by-laws, and such.

21        A.    See, you are expanding again when

22   you say "and such."  I already testified

23   that while I was at Bordelon, Hamlin,

24   Theriot, we drafted -- and I say "we."

25   Regina and I drafted the Articles of

1    Incorporation, the by-laws, the Initial

2    Report, the acceptance of affidavit, and

3    documents relating to the September 1995

4    amendment to the Articles of Incorporation.

5         Q.    So if there was a problem with

6    those documents, you were in a position to

7    know that?

8         A.    If there was a problem with those

9    documents, was I in a position to know that?

10   Yeah, I was in a position to know it, but I

11   didn't.

12        MR. SPILMAN:

13            Let me object to that answer.

14   You didn't know there was a problem with the

15   documents, or does that suggest there was a

16   problem with the documents?

17        THE WITNESS:

18            No.  I didn't know there was a

19   problem with the documents.  That's my

20   answer.

21        MR. SPILMAN:

22            Okay.

23   BY MR. GRECH:

24        Q.    Who drafted the merger documents?

25        A.    I think Tracy Bergquist did or

1    somebody in Atlanta drafted it for her, but

2    I'm speculating.

3         Q.    So you have no personal knowledge

4    of that?

5         A.    I was told by one of the officers

6    of FyBX Corporation that Tracy presented the

7    merger document to them for their signature.

8         Q.    And who told you that?

9         A.    Mr. Hondroulis.

10        Q.    He didn't tell you Tracy drafted

11   them, did he?

12        A.    Actually, he might have said,

13   "Tracy drafted these."

14        MS. MARSHALL:

15             I wonder who is practicing law.

16   Probably criminal there and here.  Certainly

17   criminal here.

18        MR. GRECH:

19             Those comments are inappropriate.

20        MS. MARSHALL:

21             I don't think they are

22   inappropriate.  They are exactly the kind of

23   comments you have been making.  And by the

24   way, we have now established, for the

25   record, that counsel who suggested that Miss

134

1    Bergquist was known as the vice president of

2    FyBX Environmental actually signed as the

3    chief operating officer and vice president.

4    So it's astonishing.  Imagine.

5        MR. GRECH:

6             I did not testify to that.  I

7    asked him questions.  I did not give any

8    testimony or make any admissions.  I resent

9    that you imply that I did.

10       MS. MARSHALL:

11            I resent what you implied about

12   my client.

13   BY MR. GRECH:

14       Q.    So you had no role in putting

15   together the merger documents?

16       A.    The merger agreement that they

17   signed was not drafted by me, nor was the

18   certificate of merger, which they signed.

19       Q.    You drafted the written consents

20   for the merger?

21       A.    Let me see what you are talking

22   about.

23       Q.    I'm referring to Exhibit 3 of

24   your deposition No. 5 of that.

25       A.    Yes.  Before I -- except for the

165

1    party, but it's like we are trying the case

2    instead of getting the information here.

3    Let's just get going.

4         MR. GRECH:

5              Could you mark that Exhibit 10.

6         THE WITNESS:

7              Yes, sir.

8    BY MR. GRECH:

9         Q.    Are you familiar with this

10   document?

11        A.    This is our witness and exhibit

12   list that we filed back on May 12th, 2003.

13        Q.    Could you tell me what testimony

14   you may call Barton Farris to give in this

15   case; what his testimony will relate to?

16        MS. MARSHALL:

17             I'm going to object because this

18   gentleman is not going to be calling anybody

19   as a witness.  I will be.  I'm the lawyer.

20   BY MR. GRECH:

21        Q.    Could you tell me what evidence

22   you think he has relevant to your case?

23        A.    Information regarding FyBX.

24        Q.    What specific information does he

25   have relevant to your defenses?

1          A.      A lot.

2          Q.      Such as?

3          A.      I guess you'll have to hear it

4    from him.

5          Q.      So just the information set forth

6    in his affidavit that you have attached to

7    the motion for summary judgment?

8          A.      I'm sure that's part of it.

9          Q.      Well, if you want to review that

10   and let me know if there is something else

11   that you know that he knows.

12         MS. MARSHALL:

13              I going to object to the extent

14   that this witness is being asked to comment

15   on what another witness is going to say,

16   particularly when, as everyone knows,

17   witnesses' testimony often is responsive to

18   other testimony being asked from other

19   people.

20              So, for example, if you guys come

21   up from with some cockamamie theory, we'll

22   have to respond to that; and we are not

23   going to be limited to what this gentleman

24   knows at this time subject to Mr. Farris.

25   If you have a more specific question other

1    than a general question like that, he can

2    answer it.

3         MR. GRECH:

4              Well, I didn't ask what you were

5    going to ask him.  I asked him what

6    evidence --

7         MS. MARSHALL:

8              I didn't ask him anything.  I

9    just made a comment about the fact that this

10   gentleman is not the lawyer in the case; and

11   that witnesses' testimony often depends on

12   what other testimony other people give; and

13   that it is inappropriate to ask one witness

14   to comment on another witness' testimony.

15        MR. GRECH:

16             I'm not asking him to comment on

17   his testimony.  I asked him what evidence he

18   has relevant to the defenses other than

19   what's in his affidavit.

20        MS. MARSHALL:

21             How is this gentleman supposed to

22   know that?  He is not the lawyer.

23        MR. GRECH:

24             Well, if he knows the information

25   that Mr. Farris has, then I have a right to

176

1   that at a meeting held by the corporation's

2   directors on January 20, 1997 they amended

3   the Articles of Incorporation.

4        MS. MARSHALL:

5            Did both of them do it

6   unanimously?

7        THE WITNESS:

8            Hold on.  That resolution was

9   signed January 21, 1997.  So my letter in

10  paragraph 5 is correct in stating that on

11  January 20th the board of shareholders of

12  FyBX Corporation voted.

13           Now, did they unanimously vote to

14  amend the articles?  I guess I inartfully

15  stated that the shareholders unanimously

16  voted because the board of directors

17  unanimously voted, and what appears to be a

18  majority of two-thirds of the voting power

19  of the corporation voted in favor, not

20  unanimously.

21        MS. MARSHALL:

22            It's in violation to write a

23  letter to that guy.

24  BY MR. GRECH:

25        Q.   Do you know if Tracy Bergquist

1

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF LOUISIANA

3    K. TRACY BERGQUIST, ON      )
     BEHALF OF HERSELF AND ALL   )
4    OTHER SHAREHOLDERS OF FYBX  )
     CORPORATION,                )
5                                )
              Plaintiff,         )
6                                )        CIVIL ACTION
          vs.                    )
7                                )        NO. 02-722
     FYBX CORPORATION, MICHAEL   )
8    P. ARATA, HOFFMAN, SIEGEL,  )        SECTION "R"
     SEYDEL, BIENVENU, CENTOLA & )
9    CORDES, (A PROFESSIONAL LAW )        MAG. (4)
     CORPORATION), and BORDELON, )
10   HAMLIN & THERIOT            )
                                 )
11            Defendants.        )
     _____)

12

13                    DEPOSITION OF

14              DIMITRIOS HONDROULIS

15

16                   June 16, 2003

17                   10:24 a.m.

18

19            127 Peachtree Street, N.E.
20       Conference Room, Candler Building
                 Atlanta, Georgia
21

22       Colleen B. Seidl, CCR-B-1113, RPR, CRR

23                  B R O W N
                 Reporting, INC.

24
              1740 Peachtree St, N.W.
25              Atlanta, GA 30309
                  404-876-8979

EXHIBIT

1    Q.    Why did you send this letter to Mr. Arata?

2    A.    I think it's quite evident.

3    Q.    Which is?

4    A.    Nothing had been done and --

5    Q.    And were you disappointed that the merger

6    documents hadn't been completed at that point?

7    A.    Was I disappointed?  Obviously I say here

8    that they have not been completed.

9    Q.    Were you disappointed?

10   A.    Disappointed is a word.  I would have

11   liked for them to have been done.  I wanted to see

12   some movement.

13   Q.    And you were expecting those from

14   Mr. Arata?

15   A.    No, that's not what I'm pointing out there

16   on Mr. Arata.  It's overall.  If you read it, it is

17   the overall things aren't moving.  It's not just that

18   one point.

19   Q.    But you were expecting him to draft the

20   merger document?

21          MS. MARSHALL:  He's already answered.

22         He didn't give you the answer you wanted,

23         but it's been asked and answered.  That's

24         too bad, isn't it?

25          (Plaintiff's Exhibit 25 was marked

97

1    A.    I can't answer that, I don't know.  I

2 don't remember if there was another page to it or

3 not.  All I'm shown here is one page, so, with a

4 staple mark in it.

5    Q.    Was this again a letter to Mr. Farris and

6 Ratowsky to convince them to go through with the

7 merger?

8    A.    No.  It was a letter to Mr. Ratowsky and

9 Mr. Farris to tell them that I was leaving myself as

10 an intermediary in the negotiations.

11    Q.    But you were recommending to them that the

12 merger went through; is that correct?

13    A.    How many times do I have to answer that?

14        MR. PRATT:  Answer it if you can.

15        THE WITNESS:  I was for the merger,

16    yes.  I thought it was a good idea.

17        MS. MARSHALL:  That's why he voted

18    for it.

19        (Plaintiff's Exhibit 28 was marked

20    for identification.)

21    Q.    (By Mr. Grech)  Let me show you what's

22 been marked as Exhibit 28.

23        MS. MARSHALL:  Once again, let's just

24    reflect that all of these exhibits.  Let me

25    just go back through them.  Exhibit 28.

117

1        go to the secretary of state's office?

2        What?  You know, can you clarify?  It's

3        kind of a vague term, due diligence.

4        Q.    (By Mr. Grech)  Are you aware he did any

5   investigation to make sure the merger was okay before

6   the merger?

7        A.    I'm sorry, it's still investigation of

8   what?  I mean, you're not being clear on that.  Did

9   he investigate?

10       Q.    Anything?

11       A.    You just can't investigate anything.  I

12  mean be more specific.  I don't know what you're

13  trying to get at.  I just want to know.  You're

14  asking me if he did any investigation.

15       Q.    Right.

16       A.    For what?

17       Q.    For the merger, to make sure it was okay?

18       A.    What was okay?

19       Q.    That it was legally in compliance?

20            MS. MARSHALL: What was legally in

21       compliance, the documents?

22            MR. GRECH:  The documents and the

23       status of the corporation.

24            MS. MARSHALL:  We're trying to be

25       reasonable.  If you want to know did he

1       look at documents or did he look back at

2       the amendments.  Ask the question for God

3       sake, let's not spend a lot of time here.

4                   THE WITNESS:  I'm sure he did.

5           Q.      (By Mr. Grech)  Are you aware of whether

6   he did?

7           A.      You're still not being specific on it, so

8   I mean I guess my answer is going to be the same as

9   your question.  It's kind of -- you're asking me

10  investigating and, I'm sorry, I just don't really

11  understand where you're getting at with this.

12          Q.      Did he ever tell you he had reviewed the

13  corporate documents in preparation of the merger

14  for --

15          A.      Which corporation?

16          Q.      -- FyBX or FyBX Environmental?

17          A.      I'm sure he had if he was our attorney.

18          Q.      Did he ever tell you that he had?

19          A.      Did he ever come in and tell me,

20  Dimitrios, I've reviewed the documents.  I don't

21  remember a conversation of that nature.

22          Q.      So you just assumed he had?

23          A.      No, I'm not saying that.  You are.

24          Q.      I'm asking you.

25          A.      I'm not saying that.  I assume that.  I'm

120

1        MR. PRATT:  By whom?

2        MR. GRECH:  By Mr. Arata.

3        THE WITNESS:  Again, I answered that

4    question.

5        MR. PRATT:  He also hasn't said

6    whether or not any due diligence was done

7    by Arata.  And again I'm going to object to

8    the fact that due diligence is a term

9    that's vague.  If you want to ask him a

10   specific question as to what documents he

11   has personal knowledge that he has examined

12   and what things Mr. Arata -- what personal

13   knowledge he has that Mr. Arata partook in

14   any association of this merger, go ahead

15   and ask him.  But you're not being

16   specific.  It's very vague.

17       Q.    (By Mr. Grech)  That's what I'm asking,

18   what personal knowledge do you have of him reviewing

19   any of the FyBX corporate documents in conjunction

20   with this merger?

21       MS. MARSHALL:  That's a first.

22       MR. PRATT:  If you have any personal

23   knowledge, answer the man's question.

24       THE WITNESS:  I know that Michael

25   reviewed the documents for FyBX for the

136

1      A.    Yes.

2            MS. MARSHALL:  What is the Alabama

3      SEC?

4            MR. GRECH:  Or securities commission.

5            MS. MARSHALL:  I'm not sure it's the

6      Alabama SEC.  God knows, we don't want to

7      be sued for a fraudulent statement.

8            (Plaintiff's Exhibit 38 was marked

9       for identification.)

10     Q.    (By Mr. Grech)  Look at Exhibit 38.

11     A.    Okay.

12     Q.    This communication is between Mr. Arata

13     and the Alabama Securities Commission that you just

14     were referring to?

15     A.    Yes.

16     Q.    Did you receive a copy of that e-mail?

17     A.    Yes.  It looks like I did.

18           (Plaintiff's Exhibit 39 was marked

19       for identification.)

20     Q.    (By Mr. Grech)  I'm showing you Exhibit

21     39.

22           MS. MARSHALL:  I'm sorry, what?

23           MR. PRATT:  39.  Again this document

24     has got underlinings in it as well, just

25      for the record.

1    all write it to each other and share ideas and it

2    goes around.  I think it was just a matter of asking

3    all of us what we need to look into.

4         Q.    So after this e-mail was sent out, you

5    didn't expect Mr. Arata to provide legal advice on

6    what filing matters need to be taken care of?

7         A.    I didn't look at that.  I mean I don't

8    understand your question.

9         Q.    Did you expect him to look into that on

10   the legal side after this e-mail went out to him?

11        A.    I didn't write this to him.

12        Q.    Yes, but you got a copy of it.

13        A.    And?

14        Q.    And I'm asking whether you expected him to

15   look into the legal issues.

16        A.    I really didn't -- no, I mean.

17             MS. MARSHALL:  Why don't you just

18        say something that will reflect that you

19        don't think that Mr. Arata was your lawyer

20        for securities purpose?  He's going to keep

21        going into it.  He thinks he can get

22        something out of you.  He's not going to

23        mention disclaimers of Mr. Arata.  That

24        wouldn't be part of the game.

25             THE WITNESS:  No.  I think that he

1    merger documents?

2        A.    I believe he did.

3        Q.    Do you know when he did?

4        A.    I don't.

5              MS. MARSHALL:  Surely you're going to

6        show him the e-mails that follow this,

7        aren't you?  I guess not.

8              (Plaintiff's Exhibit 41 was marked

9         for identification.)

10       Q.    (By Mr. Grech)  I'm showing you Exhibit

11   41.  Please let me know when you're ready.

12       A.    Okay.

13       Q.    Is this a letter from Mr. Arata that you

14   were copied on?

15       A.    I was.

16       Q.    He says he's filing the merger documents

17   with the secretary of state.

18       A.    I'm sorry, where does it say that?

19       Q.    It's directed to the Louisiana Secretary

20   of State, isn't it?

21       A.    It is.

22       Q.    It's the merger documents that are

23   included?

24       A.    It's a certificate of -- what's attached

25   is a Certificate of Merger Between FyBX Corporation

1          THE WITNESS:  This might have been
2      done by Tracy.
3      Q.     (By Mr. Grech)  Do you have any personal
4  knowledge that she did that one?
5          MS. MARSHALL:  We had this discussion
6      before.  We went through the discussion of
7      whether he watched her type it out.
8          MR. GRECH:  That was for the merger
9      agreement, not this document.
10          MS. MARSHALL:  That's true, but go
11      ahead.
12      Q.     (By Mr. Grech)  Do you have any personal
13  knowledge?  So you don't have any personal knowledge?
14      A.     On this one right here it looks like it,
15  but -- I guess it was a part of this one.  This last
16  page, Exhibit A, is part of Exhibit D1 and Exhibit
17  D2.
18          MS. MARSHALL:  So let me just see if
19      I understand this.  The only one which is
20      at issue as to whether she drafted it is
21      consent of the shareholders of FyBX
22      Environmental.  So it's the second to the
23      last page is what we're talking about?
24          THE WITNESS:  Right.
25          MS. MARSHALL:  If you don't know, you

1   don't know.

2           THE WITNESS:  No.

3           MS. MARSHALL:  If you don't have

4   memory.

5       Q.    (By Mr. Grech)  Is it your understanding

6   it was Mr. Arata's job to finalize these documents

7   and make sure they were filed?

8           MR. PRATT:  Object to the form.

9           THE WITNESS:  To submit it, yeah.

10  Whatever, to submit it again and get it in.

11      Q.    (By Mr. Grech)  So yes?

12      A.    Yes.

13      Q.    Did Mr. Arata ever tell you that documents

14  like those need to be filed before they were final

15  under the law?

16      A.    Documents like what need to be?

17      Q.    That the documents that were written in

18  the last exhibit, the ones that were sent to the

19  Louisiana Secretary of State.

20      A.    I'm sorry.  I'm sorry.

21          MS. MARSHALL:  Object to the extent

22  that it calls for this witness to issue a

23  legal conclusion.

24          MR. GRECH:  I'm asking him, did

25  Mr. Arata ever advise him of that.

149

1     Q.    In August of '99?

2     A.    He was.  It states there I was.

3     Q.    And he was providing you advice about the

4 Alabama securities issues?

5     A.    No.  He said it's impossible for me to

6 give you a blanket opinion.

7     Q.    He says I'm currently researching Alabama,

8 doesn't he?

9     MS. MARSHALL:  Well, if you want to

10     read him parts you like.  I'm just going to

11     object to say that the entire document

12     speaks for itself.  If you want him to read

13     out your pieces that you like, you know.

14     MR. GRECH:  I can ask him questions

15     about the document if I want.

16     MS. MARSHALL:  Yeah, you can.

17     Q.    (By Mr. Grech)  He says he's researching

18 Alabama, right?

19     MS. MARSHALL:  Are you asking this

20     gentleman whether it says he's researching

21     Alabama law?

22     THE WITNESS:  Yes.

23     Q.    (By Mr. Grech)  Did you get a securities

24 lawyer after this e-mail?

25     A.    No.

160

1        executed.

2              THE WITNESS:  Not to my recollection.

3        Q.    (By Mr. Grech)  With regard to that

4   Exhibit 46, is it true that some of the shareholders

5   of FyBX were issuing complaints that they felt

6   defrauded?

7        A.    There was one shareholder who complained

8   and along with him, his brother and his cousin.

9        Q.    Were they shareholders as well?

10       A.    They were.

11       Q.    So that's at least three shareholders?

12       A.    That's correct.

13             Actually I think one of the guys got two

14   other guys in and then they all just....

15       Q.    So possibly up to five shareholders were

16   complaining that they were defrauded?

17             MS. MARSHALL:  No, that's not an

18        accurate characterization of his testimony.

19        I know you're disappointed, but it's three.

20             THE WITNESS:  It's three.

21       Q.    (By Mr. Grech)  So you said one of the

22   brothers got two more guys?

23       A.    No, just those three.

24             MS. MARSHALL:  One family.

25             THE WITNESS:  One family.

1      MS. MARSHALL:  Done.

2      MR. GRECH:  From my own memory I'm

3   trying to recall.

4      MS. MARSHALL:  You can't remember

5   that?  You don't remember the answer?

6   Maybe the court reporter can go back in the

7   record and find it.

8      MR. GRECH:  It's easier for him to

9   just answer it again.

10      MS. MARSHALL:  It's easier for you to

11   keep pretending and move on.

12      THE WITNESS:  What's the question

13   here?

14   Q.    (By Mr. Grech)  Do you remember noticing

15   any meetings for shareholders?

16   A.    You know -- well, I answered at the

17   beginning that we did have shareholders meetings when

18   it was three of us, and then we noticed it to

19   ourselves.  I don't have a recollection of that, to

20   be quite honest with you.

21   Q.    So you don't know if there was new board

22   members appointed on September 20, 2000?

23   A.    You're asking me this question.  We're on

24   this, based on September 6, and I'm telling you right

25   now I don't know if we had that meeting on September

1      Q.    More than one?

2      A.    Yes.

3      Q.    When were those filed?

4      A.    I don't remember.  I don't have the dates

5 of the plan.

6      Q.    Could you tell me why FyBX has decided to

7 have a shareholders meeting on the 19th?

8      A.    We want to put all this to rest.

9      Q.    What do you mean by that?

10     A.    Well, allowing them to come in, and I just

11 think it's a good time to do this.  And no

12 explanations.

13     Q.    No explanation?

14     MS. MARSHALL:  That's a sneaky move

15     to let your shareholders know about the

16     thing that these people are complaining

17     about.  That's what it is.

18     MR. GRECH:  No, I was just trying to

19     see why all of a sudden it's coming down.

20     MR. PRATT:  He asked them also to do

21     it on your last memorandum you filed in

22     bold letters, let the shareholders vote.

23     MR. GRECH:  I mean he could have

24     answered that way.  That's why I was

25     asking.